# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 18, 2013

## STATE OF TENNESSEE v. BRIAN PATRICK PIERCE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 41100847      Michael R. Jones, Judge**

**No. M2012-02344-CCA-R3-CD - Filed September 18, 2013**

The appellant, Brian Patrick Pierce, pled guilty in the Montgomery County Circuit Court to aggravated kidnapping and aggravated robbery. The trial court sentenced the appellant to concurrent sentences of ten years for each offense. On appeal, the appellant challenges the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Jeffry S. Grimes, Clarksville, Tennessee, for the appellant, Brian Patrick Pierce.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant and his codefendant, Dexter Dewayne Alcorn, were originally indicted on charges of especially aggravated kidnapping, a Class A felony, and aggravated robbery, a Class B felony. The victim of both offenses was Anthony Steward. Subsequently, the appellant's case was severed from his codefendant's. On the morning his trial was scheduled to begin, the appellant entered guilty pleas to aggravated kidnapping and aggravated robbery, Class B felonies. The plea agreement provided that the appellant would be sentenced as a

Range I, standard offender; that the trial court would determine the length of the sentences for each conviction; and that if the petitioner testified truthfully against his codefendant, the sentences imposed would be served concurrently with each other.

At the guilty plea hearing, the State recited the following factual basis for the pleas:

> On June the 14th of 2011[,] Anthony Steward was going to get some money out of an ATM [automatic teller machine]. He stopped at a Bank of America ATM, and it was . . . approximately 10:30 in the evening. . . .
>
> As he got money out of the machine[,] an individual walked up to him, placed a handgun in his ribs, took the money, which was $400 at that point, and forced [the victim] back to [the victim's] own truck. When he got back to the truck[,] there was the accomplice, who the State would suggest is [the appellant], . . . in the driver's seat of [the victim's] truck. [The victim] was forced in the back seat by Mr. Alcorn, a codefendant, at gunpoint; they drove to . . . Regions Bank . . . [and] they attempted to take money out of there; that was denied.
>
> They went on a little ways, and made [the victim] get in the driver's set while Mr. Alcorn is in the front seat with the firearm, [the appellant] is in the back either with a firearm, depending on what – [the victim] would say he felt that there was a firearm that [the appellant] had. [The appellant's] statement was that he was using his knuckle, placed in his back and so forth, threatened him – to kill him if he [did not] cooperate and so forth.
>
> They drove . . . [to] two other banks; one was the F and M Bank, and that was around 11:09 where two $100 withdrawals were taken; that equals $600 that was taken from [the victim's] account[;] a $400 withdraw[al] was denied. They then went to a Planters Bank some seven minutes later . . . and made other attempts to withdraw money or have [the victim] withdraw money from his banking account.
>
> Then they went across the state line to Kentucky, and

-2-

went on the interstate, and c[a]me back to . . . Legend's Bank at . . . 11:35, and [a] $300 withdraw[al] was attempted, a $50 withdraw[al] was attempted and denied; there was an attempt to transfer $800 in savings to the checking that was also denied.

From that point[, the victim] was told to drive . . . to Parkway Place, which is a street, he pulled in there and they got out and left.

Now, Parkway Place i[s] significant because that's where Victor Murray lives. Victor Murray is a cousin or distant relative of Dexter Alcorn. Both Mr. Alcorn, [the appellant] , and Mr. Murray are from Arkansas. While Mr. Murray was on leave from the military, went to Arkansas, and [Alcorn and the appellant came] back to stay with him for a period of time. . . .

[The appellant's] statement . . . says so we was drinking, all of us were riding in the . . . Cadillac. We were all riding and all of a sudden we startin [sic] to see people like vulnerable by the ATM machine. And on everything, I love [Alcorn], was like oh, man, there's a lick right there. So, you know, I'm like you ain't lyin, [sic] that's a lick; that's a lick. [The appellant] goes on to say they were dropped off by Mr. Murray near the ATM, and [the appellant] and Mr. Alcorn proceeded to hide behind the bushes by the Bank of America ATM. [The appellant] says he knew Mr. Alcorn had a gun and, in fact, [the appellant] had handled the gun prior to giving it to Mr. Alcorn.

Further on in his statement[, the appellant] says he – he came out, the dude. We were going to pick any random person, you know what I'm sayin, [sic] no matter who it was. And that's the [appellant's] statement.

Overall this ordeal [the victim] went through was about a[n] hour and fifteen minutes in the vehicle after being robbed, and also trying to be taking money out as he was directed and forced and, we would consider, confined and removed substantially. And those are the facts and circumstances.

At the sentencing hearing, the State advised the trial court that the appellant's

codefendant had pled guilty; therefore, pursuant to the plea agreement, the appellant's sentences should be served concurrently. The court noted that the appellant was a Range I, standard offender and was subject to a sentence between eight to twelve years for each offense.

The victim, Anthony Steward, testified that he had been in the military for fifteen years, was married, and had two minor children. On the evening of June 14, 2011, he went to a Bank of America ATM to withdraw $400. During the transaction, a man, who was later identified as the codefendant Alcorn, walked up behind the victim and demanded his money and vehicle. The victim considered trying to defend himself until he realized Alcorn was holding a pistol.

The victim said that he stepped away from the machine. Alcorn took the money from the ATM but did not take the victim's wallet. Alcorn tried to withdraw more money, but the request was declined. Alcorn then ordered the victim to return to his truck. Another man, later identified as the appellant, was sitting in the driver's seat. The victim was placed in the back seat with Alcorn. The perpetrators discussed what they wanted to do then proceeded to a Regions Bank. They made the victim attempt to withdraw money from the ATM, but the transaction was again declined.

The victim said that they left Regions Bank and drove to a housing area off of Peacher's Mill. At that point, the perpetrators made the victim drive. They said they would kill him if he did not cooperate. During the ordeal, the men forced the victim to drive to several other ATMs. He was able to withdraw $100 from one ATM, but his attempts at the others were unsuccessful. After the last transaction, the perpetrators directed the victim to a location where they got out of the truck and walked away. The victim estimated that the encounter lasted approximately one hour and twenty minutes to one hour and forty minutes.

The victim said that throughout the ordeal, he "made it clear to them that I was cooperating . . . because I wanted to make it home to my family and my kids. That's all I was thinking about; at that point[,] I didn't even care about the money." The victim stated that the perpetrators told him, "If I try to be Superman or anything out of the ordinary that they would kill me."

The victim was certain that the person who initially approached him had a pistol. He never saw the other person with a gun; however, he said that when he was driving, he felt something cold being pressed to the back of his head and thought it was a gun.

The victim said that after the men left, he drove home. He was scared, frustrated, and wanted revenge. He tried to tell his wife what had occurred, but he "was nowhere near

-4-

talking clear or anything." Since the incident, he rarely used ATMs.

On cross-examination, the victim acknowledged that he suffered no physical injuries and that the perpetrators voluntarily released him. Some items, including one that listed his address, were taken from his vehicle.

The twenty-five-year-old appellant testified that Alcorn was the individual who approached the victim at the ATM. Alcorn had a firearm, but the appellant did not. The appellant stated that the robbery was the idea of Alcorn and Alcorn's cousin, Victor Murray. The appellant said that he, Alcorn, and Murray had been drinking that night. Murray needed money to pay for a truck he had just bought and decided they should rob someone. Murray dropped off the appellant and Alcorn at an ATM and told them to call him when they finished. The appellant said that the alcohol he drank impaired his judgment and that he felt coerced to participate in the robbery. He explained that he was from Arkansas and that he and Alcorn came to Tennessee to visit Murray, who was on leave from the Army. Murray spent all of his money on a truck, leaving the appellant no way to get home. The appellant said that he was scheduled to appear in court in Arkansas and wanted to return home to avoid being charged with failure to appear.

The appellant said that during his 441 days in jail awaiting the disposition of the case, he thought a lot about the incident. He stated that he "was young and dumb." He acknowledged that what he did was wrong but explained that there was no excuse for his behavior. He maintained that he was a good person but that sometimes "bad company corrupt[s] good character." He was around the wrong people, wanted to look "cool," and was not strong enough to refuse to participate. The appellant stated that his time in jail helped him to learn that his choices had consequences. During the offense, he did not think about the victim; he only thought about trying to get home so he would not get into trouble with the court. He said, "[A]ll I did was get myself in more trouble for not using my head."

The appellant said that he cooperated with the police "because I already did too much." He agreed to testify against Alcorn but did not have to because Alcorn agreed to plead guilty. The appellant said that he wanted to apologize to the victim and ask his forgiveness. The appellant said that he was willing to "accept[] the consequences as a man on what [he] did and [that he would] try to make it better by doing whatever [he could]."

On cross-examination, the appellant acknowledged he told police that he, Alcorn, and Murray were drinking and driving around when they began noticing vulnerable people at ATMs. When Murray talked about "hitting a lick" at an ATM, the appellant agreed that "it was a lick." They returned to Murray's house, drank more alcohol, and went out again. The appellant agreed that he and Alcorn, who was armed with a gun, hid in bushes behind an

ATM. Alcorn approached the victim, and the appellant got into the victim's vehicle. At first, the appellant drove, but he became nervous, and Alcorn instructed him to get into the back of the vehicle. The victim then began driving, and Alcorn rode in the front passenger seat. The appellant acknowledged that he received some of the money taken from the ATMs.

At the conclusion of the hearing, the trial court considered the appellant's voluntary release of the victim as a mitigating factor. See Tenn. Code Ann. § 39-13-304(b)(2). The trial court also considered as mitigation the appellant's guilty pleas and his willingness to testify against his codefendant. See Tenn. Code Ann. § 40-35-113(13).

The trial court stated that it would apply enhancement factor (1) based upon the appellant's prior conviction of criminal contempt in Arkansas, which was a Class C misdemeanor. See Tenn. Code Ann. § 40-35-114(1). The court also applied enhancement factor (5), that the appellant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense. Id. at (5). The court explained that the appellant and his codefendant had treated the victim with cruelty beyond that necessary to accomplish the offenses.

The court sentenced the appellant to ten years for each conviction, with the sentences to be served concurrently. The court said that the appellant was statutorily required to serve one hundred percent of his aggravated kidnapping sentence and eighty-five percent of his aggravated robbery sentence in confinement. See Tenn. Code Ann. § 40-35-501(2)(i)(1) and (2) and (k)(1). On appeal, the appellant challenges the length of the sentences imposed, specifically challenging the application of enhancement factors.

## II. Analysis

The appellant contends that the trial court's sentencing determinations should be reviewed de novo. We acknowledge that previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles

of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant challenges the trial court's application of the enhancement factors. First, he contends that enhancement factor (1) should not have been applied because his only prior

conviction was of criminal contempt, a Class C misdemeanor.[1] See Tenn. Code Ann. § 40-35-114(1). However, even a single, misdemeanor conviction may support the enhancement of a sentence. See State v. Souder, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002); State v. Rolly William Whitford, No. M2009-02525-CCA-R3-CD, 2011 WL 255310, at *5 (Tenn. Crim. App. at Nashville, Jan. 20, 2011). Accordingly, the trial court did not abuse its discretion by applying this enhancement factor.

The appellant also argues that the trial court should not have applied enhancement factor (5), that the appellant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. The appellant argues that "threats of serious bodily harm by means of a deadly weapon are elements of both [a]ggravating [r]obbery and [e]specially [a]ggravated [k]idnapping; so those facts cannot be used to enhance [the appellant's] sentence because they are 'already an essential element of the offense.'"

Initially, we note that the appellant did not plead guilty to the charged offense of especially aggravated kidnapping; instead, he pled guilty to the lesser-included offense of aggravated kidnapping. See Tenn. Code Ann. § 39-13-304. Generally, an enhancement factor may be applied "[i]f appropriate for the offense and if not already an essential element of the offense." Tenn. Code Ann. § 40-35-114. This court has previously stated that exceptional cruelty is not necessarily an element of the offenses of aggravated kidnapping or aggravated robbery. See State v. Kern, 909 S.W.2d 5, 7 (Tenn. Crim. App. 1993); State v. Robert Morrow, No. E2000-02796-CCA-R3-CD, 2001 WL 1105371, at *4 (Tenn. Crim. App. at Knoxville, Sept. 18, 2001). The factor is appropriate when the facts "evince a finding of exceptional cruelty 'separate and apart from the actions which constituted the offense[s].'" State v. Arnett, 49 S.W.3d 250, (Tenn. 2001) (quoting State v. Poole, 945 S.W.2d 93, 99 (Tenn. 1997)).

This court has previously stated that "'[a] threat of the victim being shot is inherent in the offense of an especially aggravated kidnapping that is committed by the use of a firearm.'" State v. Turner, 41 S.W.3d 663, (Tenn. Crim. App. 2000) (quoting State v. Quinton Cage, No. 01C01-9605-CC-00179, 1999 WL 30595, at *10 (Tenn. Crim. App. at Nashville, Jan. 26, 1999)). The trial court acknowledged that fact but found that the enhancement factor was applicable because:

---

[1] While the appellant's case was pending on appeal, our supreme court released State v. Tracy Rose Baker, __ S.W.3d __, No. M2011-01381-SC-R11-PC, 2013 WL 4768309 (Tenn. at Nashville, Sept. 6, 2013). In Rose, our supreme court held that "[a] finding of criminal contempt pursuant to Tennessee Code Annotated section 29-9-102 is not a criminal conviction" for the purposes of post-conviction. Id. at *8. However, in his brief, the appellant acknowledges that contempt of court is a Class C misdemeanor in Arkansas. See Ark. Code Ann. § 16-10-108(b)(1).

[T]he statute on kidnapping talks about the substantial interference with one's liberty, or words to that [e]ffect. Under the new instructions it's somewhat defined a little better. But it's not an hour, an hour-and-a-half driving around with a gun stuck to your head or – so you – pointed at you, telling you that you're not going to see your children again unless you cooperate, telling them that you're going to be killed if you don't cooperate. This is repeated comments of threats to kill to this victim. You know, that could well have been satisfied with the first robbery, but no, they wanted more money and continued with this kidnapping and drove – or had this victim drive around that end of Clarksville trying to get more money out of ATM machines with at least one gun pointed at him, perhaps another to the back of his head. To me that's [exceptional] cruelty; much more th[a]n [what was] necessary to accomplish the act of aggravated kidnapping.

In other words, the trial court found that the appellant's behavior during the offense went beyond that necessary to commit the offenses. See Poole, 945 S.W.2d at 99. There is nothing in the record to preponderate against this finding. Therefore, we conclude that the trial court did not abuse its discretion in sentencing the appellant.

Moreover, regardless of any alleged error in applying enhancement factors, the trial court nevertheless correctly sentenced the appellant based upon the principles and purposes of sentencing. See Bise, 380 S.W.3d at 702; Tenn. Code Ann. §§ 40-35-102(1), (3)(A); 40-35-103(1)(B), (2), (4), (5).

### III. Conclusion

In sum, we conclude that the trial court did not err in sentencing the appellant to concurrent sentences of ten years for each offense. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-9-